**Charles GOTHARD, Appellant,**

v.

**Robert Hill MARR et al., Appellees.**

**No. 5985.**

Court of Civil Appeals of Texas, Waco.

April 26, 1979.

Charles Holt, Jr., Law Offices of Ralph M. Hall, Rockwall, for appellant.

Jack Pew, Jr., and Gerald W. Benson, Jackson, Walker, Winstead, Cantwell & Miller, Schuyler B. Marshall, IV, and Gerald H. Grissom, Thompson, Knight, Simmons & Bullion, Dallas, for appellees.

HALL, Justice.

Plaintiff-appellant Charles Gothard brought this suit against defendants-appellees Robert J. Marr and National Federation of Independent Business for damages allegedly suffered by him as the result of injuries to his neck, left shoulder, back, and right hip in a collision between the automobile he was driving and one being operated by Jerri Lynn Bardin. The collision occurred in this fashion: Defendant Marr drove his vehicle into the rear of the Bardin vehicle, and Miss Bardin's car was thereby propelled into the left door and quarter panel of plaintiff's vehicle. Plaintiff pleaded negligent causation against Marr, and alleged that Marr was in the course and scope of his employment with defendant National Federation when the accident happened. Marr expressly admitted his negligence caused the collision, but he denied that plaintiff was injured and pleaded that plaintiff's physical complaints stemmed from pre-existing injuries and diseases. National Federation answered with a general denial.

The collision in question occurred in the City of Wylie, Texas, on May 9, 1975. The case was tried to a jury in January 1978.

It is undisputed in the record that in 1949 when plaintiff was 16 years of age his right hip joint was fractured in an automobile accident, and that by 1970 he had suffered severe degenerative arthritis in the joint. It is also uncontradicted that in January, 1976, the right hip joint was surgically removed and replaced with a prosthesis made of stainless steel and plastic.

The principal questions litigated by the parties were whether plaintiff's right hip was injured in the accident in question, and, if it was, whether the hip surgery was the result of the injury.

During preparation of the court's charge to the jury, defendants initially requested a special issue on the question of any injury to plaintiff, an issue on the question of injury specifically to plaintiff's right hip, and an instruction relating to the damage issues on the question of aggravation of plaintiff's pre-existing condition. The court refused to submit the specific injury issue, stating that the instruction on aggravation would be adequate and that the parties would know whether the jury found hip injury or not by the large or small awards made by the jury in answers to the damage issues. All parties acceded to that submission of the case to the jury.

In connection with the damage issues, the jury was given this instruction by the court:

"You will not allow any sum of money for physical pain and mental anguish, if any, either past or future, or for loss of earnings, if any, in the past, or loss of earning capacity, if any, in the future, to the Plaintiff resulting from any condition, disease or injury, if any, which existed in Charles Gothard prior to the accident of May 9, 1975, except as that condition, disease or injury, if any, may have been aggravated by the injuries, if any, sustained by him on said date, and then only to the extent of such aggravation. You are further instructed not to allow any sums of money for any diseases, conditions or injuries, if any, which occurred subsequent to said date which were not caused by the accident made the basis of this suit."

After finding that plaintiff was injured in the collision and that Marr was in the course and scope of his employment at the time of the accident, the jury made these answers to the damage issues:

1. Past physical pain and mental anguish: $20,000.00.

2. Future physical pain and mental anguish: None.

3. Past medical expenses: $1,666.55.

4. Future medical expenses: None.

5. Loss of earnings in the past: None.

6. Loss of earning capacity in the future: None.

The jurors were unanimous in their verdict.

Judgment was rendered on the verdict and on Marr's admission of liability in favor

of plaintiff against the defendants for the sum $21,666.55.

Only plaintiff appeals. He contends that all the jury's answers to the damage issues except item number one, above, are against the great weight and preponderance of the evidence. He also asserts that certain insurance forms signed by him were erroneously admitted into evidence over his objection. We affirm the judgment.

After the collision plaintiff was seen by his family physician, Dr. Charles Daniel Hille, a general practitioner, on the day of the collision and again on May 16th, one week later. Dr. Hille treated plaintiff for complaints of injuries to plaintiff's neck and shoulder. On the May 16th visit Dr. Hille referred plaintiff to Dr. Robert Gibson Winans, an orthopedic surgeon. Dr. Winans continued treating plaintiff for complaints of neck and shoulder pain from May 19th until September 17th, when he also began treating plaintiff for complaint of pain in the right hip. Eventually, on January 28, 1976, Dr. Winans performed the hip replacement surgery. Plaintiff's last visit to Dr. Winans was on September 8, 1977. Dr. Winans's total bill to plaintiff was $2,610.50. Plaintiff's hospital bill, which was only for the hip surgery, was $4,896.10. On November 15, 1977, plaintiff went to see Dr. William Howard Wisner regarding the need of replacing the prosthesis implanted by Dr. Winans with a new one to alleviate continuing hip pain. Dr. Wisner's bill to the time of trial was $236.00. He inferred that within two years plaintiff would need the new implant, and stated that plaintiff's total medical expenses for the surgery and follow-up care would be "roughly $6,000.00."

■ The jury's answers to the damage issues implicitly carry the additional finding that plaintiff's hip surgery was not precipitated by the collision in question. Accordingly the factual sufficiency of the evidence to support that implied finding is treated by the parties as the principal question under plaintiff's points of error contesting the awards of damages. Most of the record is devoted to that issue, and the evidence on it is detailed and in great conflict.

Plaintiff testified to these facts: He left school in the seventh grade at the age of thirteen and secured a job as a farm hand to help support his large family of brothers and sisters. He was hospitalized for about a week for treatment of the fracture of his right hip in 1949. Three weeks after the injury, he returned to his job on the farm, and within two months after the injury he had fully recovered and was performing and continued to perform all the duties of hard labor common to a farm hand. In 1952, he left the farm for a job in a hat factory. The work at the hat factory entailed stooping, bending and turning, and some lifting. By hard work and attention to duty he later attained the position of department supervisor at the factory. In 1971, he left the factory to go into business for himself and purchased an automobile service station in the City of Wylie. Although he owned and managed the station and had two full-time employees including a mechanic, and a part-time employee, he also worked as an attendant at the station performing all the duties necessary for servicing automobiles such as pumping gas, fixing flats, changing tires, and making road calls. Those activities required stooping, bending, twisting, and lifting. Plaintiff was operating the station at the time of the collision on May 9, 1975. The collision pushed the left door of his automobile against his left shoulder and also caused his right hip to strike the automotive console located between the front bucket seats of his car. As the result of the collision, he suffered injuries to and pain in his neck and shoulder, left elbow, low back, and right hip. He was incapacitated by the pain and suffering caused by the injuries, especially by the pain in the right hip, to the extent that he could no longer operate the service station. For that reason, he sold the station on July 1, 1975. The gradual worsening of the hip pain forced him to yield to the implantation of the artificial hip joint in January, 1976.

The essence of plaintiff's testimony was that until the collision in May, 1975, he

suffered no pain in his right hip and no physical incapacity as the result of the fracture in 1949; that since the time of the collision he has suffered severe pain in the hip, has limped, and has been physically disabled and unable to work, and that the sale of his business and the hip surgery resulted from the injury. Plaintiff's testimony that he suffered no physical infirmity prior to the collision was corroborated by the farmer for whom he worked as a boy, by a former co-worker at the hat factory, and by several friends in the City of Wylie, including Ray Rodgers who was the passenger in plaintiff's car at the time of the accident, plaintiff's part-time bookkeeper, the policeman who investigated the collision, and the young woman who was driving the car that collided with plaintiff's vehicle.

In 1970, when plaintiff was being treated for a peptic ulcer, an x-ray was made which included his hip joints. The medical witnesses were in agreement that the x-ray showed that by 1970 plaintiff has suffered severe degenerative arthritis in his right hip in several particulars, and that as a result of that degeneration he was a candidate for hip surgery at some indeterminable time in the future. The time of the surgery would turn solely upon plaintiff's subjective need of it to relieve pain and incapacity caused by the diseased hip joint. Other x-rays were made of plaintiff's hip in September and December, 1975. Based upon those x-rays, Dr. Winans said he saw a "suspicion" of change in the condition of the hip between 1970 and 1975. Dr. Wisner said he saw none. Dr. Billy Joe Parnell, a radiologist whose specialty is interpretation of x-rays and fluoroscopy said there had been "definite progression" in the degenerative disease of plaintiff's hip during the five-year term, and that it would have been expected from the nature of plaintiff's work during that time.

Dr. Hille, Dr. Winans, and Dr. Wisner all expressed the opinion that in reasonable medical probability the need of hip surgery resulted from the injury to the hip plaintiff said he sustained in the collision. However, the testimony of Dr. Winans and Dr. Wisner shows that the need or not of an artificial hip by reason of arthritic degeneration is wholly subjective, and that the implant should not and will not be performed until requested by the patient. Their opinion that plaintiff's hip surgery was caused by injury in the collision was based solely upon plaintiff's statements to them to that effect. Additionally, Dr. Winans testified that the connection was "minimal at most"; Dr. Wisner admitted that he has been assigned an interest in plaintiff's recovery in this lawsuit for payment of his future medical bills which will include a new prosthesis; and Dr. Hille readily conceded that he is not knowledgeable in the field of orthopedics.

Dr. Hille testified he saw plaintiff soon after the collision on the day it occurred (May 9th). Plaintiff complained of pain in the left shoulder and neck, but not in the hip. After x-rays were made, Dr. Hille arrived at a diagnosis of "sprained left shoulder and whiplash of the neck." Plaintiff had gone to Dr. Hille about two weeks prior to the accident, on April 28th, complaining of "fairly severe pains across the upper neck and back of his head" and "something popping in his neck." Dr. Hille testified he next saw plaintiff on May 16th; that on that visit plaintiff complained of pain in his neck, shoulder, and left elbow, but not in his hip; and that on that visit he referred plaintiff to Dr. Winans, an orthopedist, for treatment of the neck and shoulder and elbow pain. After Dr. Hille had testified, plaintiff testified that his hip was hurting on both visits with Dr. Hille; that he did not tell Dr. Hille about the hip pain on May 9th, and that he did not remember whether he told the doctor on May 16th. However, in his pre-trial deposition taken in December, 1976, plaintiff testified he told Dr. Hille about the hip pain on both visits.

Dr. Winans testified he first saw plaintiff on May 19th, and that plaintiff gave him a history of injury to his left shoulder and neck in the collision on May 9th, and complained of pain in the shoulder and neck and left arm, but that plaintiff did not mention hip injury nor complain of pain in the hip. Dr. Winans diagnosed plaintiff's

problem as a sprain involving the neck and the nerves leading from the neck into the arm. Dr. Winans saw plaintiff again on May 27th, June 3rd, and June 10th. Plaintiff did not mention hip pain on those visits, but complained only of his elbow, neck, and shoulder. Dr. Winans treated plaintiff with heat, physical therapy, and medication. According to Dr. Winans, plaintiff was "much better" by June 10th, and he released plaintiff to return to work, without limitation. Plaintiff did not thereafter see a doctor until he returned to Dr. Winans two months later, on August 6th.

Plaintiff testified that Dr. Winans was "wrong" when he said he gave plaintiff a general release on June 10th; that on that day and at all times after the accident he was unable to work and was only able to go to his service station "off and on"; that he was required to hire two additional part-time employees; that his business "fell off" in May and June; and that he was forced to sell the station on July 1st · because "I couldn't take care of it myself." Plaintiff's co-worker from the hat factory testified that when he saw plaintiff at the station two or three weeks after the collision plaintiff was in a reclining chair he had moved into the station; and that plaintiff was limping and and "would lean on anything that he could to get to the cash register, which was fairly close."

Evidence was adduced by defendants which showed that plaintiff's profits at the station for May and June, 1975, equalled or exceeded the average for the first six months of that year and for the whole year 1974, although his labor costs were also higher during those two months. Plaintiff· was asked why, with those profits, he didn't "stay and supervise the business and continue to make that kind of money?" He said, "Because I· wasn't able to." "Q. You weren't able to sit there and supervise and watch? A. No, sir, because it hurts to sit." Immediately thereafter, plaintiff denied that he went to Las Vegas, Nevada, with two men on July 22nd or at anytime since June 30, 1975, and testified that he was "never there." Later, on redirect, plaintiff changed that testimony and said that he

had gone to Las Vegas in July, 1975; that he was confused on the date and had thought it was before the accident, but that during recess his wife had told him it was after the accident; and that the Las Vegas trip in July was made before he began having "severe back problems and hip problems."

Ronald Dale McMayon gave this testimony: He lived in the City of Wylie during the years 1972 through 1975. He knew plaintiff during that period. They each visited in the other's home. During that time, prior to the accident in question, plaintiff walked with a limp and complained of pain in his right hip. Although in earlier times plaintiff engaged in manual labor at the station like changing tires, from approximately January, 1975, until the collision in May, plaintiff was "primarily managing it, sitting at his desk, pumping gas on occasions." McMayon offered to buy the service station prior to May, 1975, but plaintiff would not sell. However, plaintiff sold him the station on July 1, 1975. Plaintiff told the witness that the reason he changed his mind and decided to sell the station was because "he could not maintain his business and pursue the goal that he had in mind at that time . . . to acquire some money from that automobile accident." McMayon also testified that after he purchased the station he accused plaintiff of stealing from him in the transaction, that plaintiff struck him in the mouth, and that they are now "bitter enemies."

Plaintiff's next visit to Dr. Winans after June 10, 1975, was approximately two months later, on August 6th. His complaint then was "still stiffness in the left shoulder area, particularly after activity." The next visit was on September 2nd, when plaintiff complained of the shoulder stiffness and also of low back pain; Dr. Winans said, "He did state then that he had an old injury in 1949 which did not bother him until recently. He had no pain that radiated into the legs." Plaintiff saw Dr. Winans again on September 17th. The doctor stated, "He hadn't complained of his hip yet, until this particular visit. He was com-

plaining of his back until this visit and examination at that time revealed limited range of motion in his back. At that time he was describing some pain in the right hip. This he told me at the time. It had been cracked in the accident in 1949 and he was having more symptoms with this hip, particularly with long walking. Examination of the hip at that time revealed quite a bit of limitation of motion in the hip. It just didn't move normally in any direction. He was having quite a bit of pain. It certainly was disabling to some degree." He testified that "it would seem reasonable" that if plaintiff's hip had been injured in the collision plaintiff would have complained to him about pain in the hip "in something less than four months." He also said the delay could have been caused by decreased activity necessitated by the other injuries, causing stress and weakening of the back which in turn caused the hip to become symptomatic; and that the medications prescribed for the other injuries could also have delayed the hip pain coming forward.

After September 17th Dr. Winans's treatments included plaintiff's right hip. He testified plaintiff had fully recovered from the other complaints by October 27th. On December 2nd, plaintiff expressed the wish for the hip surgery and prosthesis. On January 28, 1976, Dr. Winans performed the surgery.

Plaintiff stated in his deposition that he complained of hip pain to Dr. Winans on the visits prior to September 17th. At the trial he said that if he did not tell Dr. Winans, then he told Dr. Winans's therapist, whom he identified as "Dr. Peck." However, Dr. Peck did not testify. Plaintiff denied that he had signed any statements or forms which in their effect showed that in July and August the only injuries he was asserting he received in the collision were to his neck and shoulder. Three proofs of loss executed by plaintiff for sickness and accident insurance benefits and an accompanying "Attending Physician's Statement" signed by Dr. Winans were then admitted into evidence on defendants' tender. One claim was dated July 11, 1975, another Au-

gust 1st, and the last October 6th. The attending physician's statement was dated July 1st. In the first two claims and the physician's statement the injuries received by plaintiff in the collision were stated to be to the neck and shoulder; in the last claim plaintiff's injuries were described as "neck-shoulder, left arm and found out later [right] hip."

Although there is much more evidence that is relevant on the issues, we close our recitation of the record with these facts: Plaintiff did not call any of his employees as witnesses in the case. And, he did not call his wife to testify, although she was identified by the witness McMayon as sitting beside plaintiff during the trial. The record does not show why those persons were not called.

Considering the whole record, we hold the jury's answers to the damage issues are not against the great weight and preponderance of the evidence.

■ Plaintiff objected to the introduction of the proofs of loss for insurance benefits on the grounds that they violated the "collateral source rule" and that they injected insurance into the case. The objections were overruled. He assigns error to those rulings. The proofs of loss did not show any sums received by plaintiff. Defendants tendered the instruments for the limited purpose of impeaching plaintiff. Under the record at that time, the claims were admissible for that purpose. They met the test of being "clearly relevant and with substantial probative value on [a] disputed issue in the case" enunciated by our Supreme Court in *Kainer v. Walker,* 377 S.W.2d 613, 617 (Tex.1964), to govern the introduction of such evidence. See also, *Griggs Furniture Company v. Bufkin,* 348 S.W.2d 867, 870 (Tex.Civ.App.—Amarillo 1961, writ ref'd n.r.e.).

Appellant's points are overruled. The judgment is affirmed.