# IN THE SUPREME COURT OF TEXAS

══════════

No. 15-0921

══════════

UNITED SCAFFOLDING, INC., PETITIONER,

v.

JAMES LEVINE, RESPONDENT

════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

════════════════════════════════════════

JUSTICE BOYD, joined by JUSTICE LEHRMANN and JUSTICE DEVINE, dissenting.

James Levine was injured while working at his employer's refinery when he fell through the platform of a scaffold. According to Levine, a piece of plywood that should have been nailed into the platform but was not slid out from under him, causing him to fall through the resulting hole. As a result of this so-called "slip-and-fall," *ante* at ___, Levine strained his neck. A jury awarded him nearly $2 million. That's a lot of money for a neck strain.[1] But the defendant—United Scaffolding, Inc. (USI)—does not merely complain about the amount of damages. Instead, USI argues that Levine cannot recover at all because the trial court asked the jury an ordinary-

---

[1] When the parties first tried the case, the jury awarded $178,000, which seems much less surprising for that kind of injury. *See, e.g.*, *Hospadales v. McCoy*, 513 S.W.3d 724, 729 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ($292,000); *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 587 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ($679,627.02); *Metro. Transit Auth. v. McChristian*, 449 S.W.3d 846, 849 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ($27,650); *Gothard v. Marr*, 581 S.W.2d 276, 278 (Tex. Civ. App.—Waco 1979, no writ) ($21,666.55). The trial court granted Levine's motion for new trial, however, and the second jury awarded nearly $2 million.

negligence question instead of a premises-liability question. Ironically, USI itself proposed the ordinary-negligence question and never withdrew that proposal. Nevertheless, the Court agrees with USI, reverses, and renders a take-nothing judgment. I respectfully dissent.

## I.
## Misstatements

The jury found that USI's negligence proximately caused Levine's injuries. The trial court rendered judgment on that verdict, and the court of appeals affirmed. — S.W.3d —. The Court now reverses and renders judgment for USI, holding Levine could not recover from USI based on ordinary negligence, and instead could only have recovered based on premises liability. To reach that result, however, the Court misstates the standard of review, the pleadings, and the evidence.

### A.    The standard of review

"Control" determines the outcome of this case. As the Court explains, premises liability applies if USI controlled the scaffold on which Levine was injured and thus had "responsibility for dangerous conditions on it." *Ante* at ___ (quoting *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016)). Whether USI owed Levine a premises liability duty "must be determined by examining whether USI maintained a right to control the scaffold that allegedly caused Levine's injury." *Id.* at ___. More specifically, premises liability applies only if USI had the right to control the premises both *where* and *when* Levine's accident occurred. *See Cty. of Cameron v. Brown*, 80 S.W.3d 549, 554 (Tex. 2002); *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53–54 (Tex. 1997).[2] Premises-liability duties "generally run[] with the ownership or control of the

---

[2] *See also Wilson v. Tex. Parks & Wildlife Dep't*, 8 S.W.3d 634, 635 (Tex. 1999) (per curiam) ("As a rule, to prevail on a premises liability claim a plaintiff must prove that the defendant possessed—that is, owned, occupied, or controlled—the premises where injury occurred.") (citing *City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986)).

property" and do not apply to a contractor who does not "own or control the premises *at the time of [the] accident.*" *Occidental,* 478 S.W.3d at 643–44 (emphasis added). Because "the essential element" of a premises-liability claim is the defendant's control of the premises "*on the date in question*," premises liability does not apply to a contractor who does not control the premises when the accident occurs. *Lefmark*, 946 S.W.2d at 53–54 (emphasis added).

USI contends that the ordinary-negligence question the jury answered at trial was erroneous and the trial court should not have submitted it because USI controlled the scaffold when Levine's injury occurred. The Court agrees, holding USI owed only premises-liability duties because "Levine's allegations and the evidence *establish* that the nature of Levine's claim relies on USI's having retained the right to control" the scaffold when the accident occurred. *Ante* at ___ (emphasis added). But the Court does not explain what it means when it says the evidence "establishes" control. Although the Court apparently rejects the idea that the evidence must *conclusively* establish control, it ultimately ignores the evidentiary-review standard altogether. By doing so, it misstates and misapplies our well-established standard of review.

Under our clear and consistent precedent, we may conclude that the ordinary-negligence question was erroneous and the trial court should not have submitted it to the jury only if it has "no basis in the law or the evidence." *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 215 (Tex. 2005); *see Harris Cty. v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002) ("[T]he trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence."); *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) (explaining trial courts' duty "to submit requested questions to the jury if the pleadings and any evidence support them"); *see also* TEX. R. APP. P. 61.1(a) (stating that this Court may not reverse a judgment unless the complained-

3

of error "probably caused the rendition of an improper judgment"). USI does not contend that an ordinary-negligence question has "no basis in the law," so it must instead establish that "no evidence" supported its submission to the jury. *See Romero*, 166 S.W.3d at 215; *see also Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999) (holding trial court should not have submitted breach-of-implied-warranty claim because "no evidence" supported it). To prevail on its argument that the trial court should not have submitted the ordinary-negligence question, USI must establish that *no* record evidence supports the jury's ordinary-negligence finding. *See Garza v. Alviar,* 395 S.W.2d 821, 824 (Tex. 1965) (holding trial court errs in submitting question to jury only if no evidence supports the question).

If the ordinary-negligence question "is supported by *some* evidence," Levine was "entitled to have [the question] submitted to the jury," *Triplex Commc'ns, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex. 1995) (emphasis added), and the trial court would have abused its discretion by refusing to submit it, *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009) (concluding trial court abused its discretion by refusing to submit jury instruction "supported by the pleadings and evidence"). So we must focus on whether the allegations and evidence support the ordinary-negligence theory USI proposed and the trial court submitted at trial. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986) (holding trial court properly submitted jury issues because "there is some evidence to support submission of these issues"). To answer that question, "we must examine the record for evidence supporting [the question] *and ignore all evidence to the contrary*." *Elbaor*, 845 S.W.2d at 243 (emphasis added).

The Court does not apply this standard of review. In fact, the Court never explains what evidentiary standard it applies. On the one hand, it asserts that the evidence "establishes" and

4

"compel[s]" the conclusion that USI had a right to control the scaffold and "do[es] not support" Levine's assertion "that USI had no control." *Ante* at ___, ___, ___. On the other hand, the Court asserts merely that the evidence "reflects" or is "consistent" with an allegation that USI controlled the scaffold. *Id.* at ___, ___. The Court expressly rejects our well-established standard of review as "inapplicable" and asserts that our review does not depend on "some sort of sufficiency-of-the-evidence standard." *Id.* at ___ n.1.

According to the Court, we determine the claim's proper nature "by first determining the source of the plaintiff's alleged injury—premises defect—and then determining the duties owed, concluding that the general contractor defendant owed the plaintiff premises duties *if it retained a right to control the work that created the dangerous condition*." *Id.* at ___ n.1 (emphasis added) (citing *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528–29 (1997)). But we can only know whether the defendant "retained a right to control the work" by looking to evidence in the record, so we necessarily must apply "some sort of sufficiency-of-the-evidence standard." Presumably (and contrary to our precedent), the Court believes we can conclude that USI retained a right to control the work if *some* evidence supports that conclusion, even if other evidence establishes the contrary. But the Court avoids the issue by refusing to say what evidentiary-review standard it is applying. Even though our determination of whether USI controlled the scaffold necessarily depends on the record evidence, the Court simply ignores the evidentiary-review standard altogether.

As the Court notes, we determine whether a trial court submitted an erroneous jury question by considering "the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety." *Ante* at ___ (quoting *Hawley*, 284 S.W.3d at 862). But we

5

consider these to determine whether any allegations and evidence support the question the court submitted at trial, not whether any allegations and evidence would support a different question the defendant urges on appeal. If the ordinary-negligence question is "raised by the written pleadings and the evidence," it is not erroneous and the trial court *must* submit it. TEX. R. CIV. P. 278; *Rodriguez*, 995 S.W.2d at 663. This "substantive, non-discretionary directive" *requires* trial courts "to submit requested questions to the jury if the pleadings and *any* evidence support them." *Elbaor*, 845 S.W.2d at 243 (emphasis added). "A trial court may refuse to submit an issue only if *no evidence* exists to warrant its submission." *Id*. (emphasis added).

The Court asserts that whether Levine's claim sounds in ordinary negligence or premises liability is a "legal question" we review de novo, because the question of whether "a condition that allegedly caused the plaintiff's injury *is a premises defect* is a legal question." *Ante* at ___ (emphasis added) (citing *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 385 (Tex. 2016)). But we need not decide whether the condition that caused Levine's injury was a premises defect—no one disputes that it was. Instead, we must decide whether USI controlled the premises where and when Levine's injury occurred. And though "the character of Levine's claim" may be a "legal question," *ante* at ___ n.1, we must answer the question based on "*the facts* surrounding the occurrence in question." *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995) (emphasis added). When, as here, the answer depends on whether USI had a right to control the scaffold, we may only answer the question as a matter of law if the evidence is legally insufficient to establish control—or on the other hand, conclusively establishes control. *See id.* at 199 (concluding that "no facts" supported even "a fair inference" of control); *see also Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015) (concluding that "even in the light most favorable to

6

[the plaintiff], no evidence shows that [defendant] controlled, operated, or directed the operation of the trucks involved in the hauling operations at issue"); *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 224 (Tex. 1999) (holding that plaintiff's evidence was not "legally sufficient evidence of the premises owner's 'right to control' in a premises liability case").

Ultimately, the Court bases its approach on a misreading of our decision in *Olivo*, in which we "explicitly required that the trial court submit the [premises-liability] elements in a premises defect case" and held that because the plaintiffs "did not obtain a jury finding that included essential elements of their premises defect claim, they cannot recover." *Ante* at ___ n.1 (quoting *Olivo*, 952 S.W.2d at 529). According to the Court, we can ignore our well-established standard of review in this case because, pursuant to *Olivo*, "a premises defect case improperly submitted to the jury under only a general-negligence question, without the elements of premises liability as instructions or definitions, causes the rendition of an improper judgment." *Id.* at ___ (citing *Olivo*, 952 S.W.2d 529).

But it was undisputed in *Olivo* that the contractor controlled the premises where and when the injury occurred. 952 S.W.2d at 526–27 (explaining that the contractor "operated" the oil and gas lease and had an "on-site representative" on the premises where and when the injury occurred); *see id.* at 527 (explaining that the contractor "occupied the leased land").[3] The issue in *Olivo* was

---

[3] What *was* disputed in *Olivo* (and is *not* at issue here) was "what duty, if any," the "contractor in control" of the premises owed to an "employee of an independent contractor." 952 S.W.2d at 527. Because the general contractor occupied and controlled the premises, it owed duties that could give rise to "two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect." *Id.* (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985)). Because the independent contractor's employee alleged only that he was injured by equipment "previously left on the ground," and "not as a contemporaneous result of someone's negligence," *Olivo* was necessarily "a premises defect case." *Id.* The question in *Olivo* was whether a contractor that indisputably occupied and controlled the premises where and when the accident occurred was liable for a dangerous condition that injured an independent contractor's employee.

7

whether the contractor controlled an *independent contractor's work* that created the dangerous condition on the premises, not whether the contractor occupied or controlled *the premises where and when the injury occurred*. *Id.* The evidence in *Olivo* conclusively established that the contractor controlled the premises. Because that fact was undisputed, we explained that the "contractor in control" was "charged with the same duty as an owner or occupier," so the plaintiff could only bring a premises-liability claim and had to prove the unique elements of that claim. *Id.* at 527, 529.

By ignoring this crucial distinction, the Court reaches a result that is inconsistent with the well-established principle that premises liability applies to a contractor who controlled or had the right to control the premises where and when the injury occurred. *Occidental*, 478 S.W.3d at 643–44; *Lefmark*, 946 S.W.2d at 54. The Court agrees with this principle, explaining that "a defendant's liability under a premises liability theory rests on the defendant's assumption of control of the premises and responsibility for dangerous conditions on it." *Ante* at ___. But relying on *Olivo*, the Court asserts that any claim based on an injury that results from a "premises defect"—a dangerous

---

When, as in *Olivo*, the dangerous condition "aris[es] out of the independent contractor's work," the general contractor who controls the premises only owes a duty to the independent contractor's employee if the general contractor retained "supervisory control" over *the independent contractor's work* and that control "relate[d] to the condition or activity that caused the injury." *Id.* at 528. The controlling factor in *Olivo* was whether the contractor had a "right to control the [independent contractor's] defect-producing work," *id.* at 529; the fact that the contractor controlled the premises where and when the injury occurred—and thus owed premises-liability duties—was simply undisputed. Because it was undisputed that the contractor controlled the premises where and when the injury occurred and that the employee's injury resulted from a dangerous condition on the premises, his claim was necessarily a premises-liability claim. And because the independent contractor created the dangerous condition, the plaintiff had to prove that the contractor controlled the independent contractor's work. *Id.*

I do not, as the Court asserts, suggest that *Olivo* should be overruled. *Ante* at ___ n.1. Because Levine was not USI's subcontractor's employee and Levine's employer did not create the dangerous condition, the *Olivo* issue of whether USI controlled the "defect-producing work" is simply irrelevant here. *Olivo* did not involve the issue of whether the pleadings and evidence conclusively established that the contractor occupied and controlled the premises at the time of the injury; it was simply undisputed that it did. We said in *Olivo* that the trial court was required to "submit the [premises-liability] elements in a premises defect case" because it was undisputed that *Olivo* was a premises-liability case. 952 S.W.2d at 529.

8

condition on the premises—must necessarily be a premises-liability claim. *Id.* at ___ n.1 (asserting that in *Olivo* we "considered the character of the plaintiff's claim by first determining the source of the plaintiff's alleged injury—premises defect"). A claim based on a "premises defect," however, must necessarily be a premises-liability claim *only* if the defendant owned, occupied, or controlled the premises where and when the injury occurred.[4] The Court errs by assuming that any claim based on injury caused by a dangerous premises condition must necessarily be a claim for premises-liability, even if the defendant did not control the premises where and when the injury occurred.

To prevail on this appeal, USI must demonstrate that Levine *only* alleged or that the evidence *conclusively* established that USI controlled or had the right to control the scaffold when Levine was injured. *See Sw. Energy Prod. v. Berry-Hefland*, 491 S.W.3d 699, 713 (Tex. 2016) (explaining that evidence is legally insufficient if "evidence of a vital fact is completely absent" or the evidence "establishes conclusively the opposite of a vital fact"). To the extent the Court concludes USI has met that burden, it is only because the Court misstates the pleadings and the evidence as well.

**B.      The pleadings**

The Court misstates Levine's pleadings by asserting he alleged USI controlled the scaffold when Levine suffered injury and he thus alleged *only* a premises-liability claim. *Ante* at ___. In fact, he alleged only that USI controlled the scaffold when it constructed the scaffold at least a

---

[4] If a claim results from a premises defect that a contractor created but the contractor relinquished control of the premises before any injury occurred, the contractor may be liable for ordinary negligence for creating the defective condition, but cannot be liable under premises liability. *See infra* n.9. Control "on the date in question" is "the essential element" of a premises-liability claim. *Lefmark*, 946 S.W.2d at 54.

9

week before Levine's injury, and he asserted only a general "negligence" claim. To the extent he alleged facts that could support either a premises-liability claim or an ordinary-negligence claim, he expressly pled his allegations in the alternative.

Levine alleged he was injured on December 26, 2005, at the Port Arthur Valero facility "while working on a scaffolding[,] which had been erected/constructed/supervised/built by" USI and its superintendent, Bob Travis. According to the petition, Levine "fell into a[n] opening caused by [USI's] failure to secure, or, at a minimum, properly secure flooring on the scaffolding." Levine alleged the "incident and all damages and injuries resulting therefrom . . . were caused solely by the acts, wrongs, and/or omissions of [USI]." Based on these facts, Levine asserted that USI was "guilty of certain acts, wrongs, and/or omissions, *each and all amounting to negligence*." (Emphasis added).

The Court asserts that the "only fair reading of Levine's pleadings" necessarily "*requires the determination that Levine did in fact allege that USI assumed and retained the right to control the scaffolding it constructed*." *Ante* at ___ (emphasis added).[5] Based on this "fair reading" of Levine's petition, the Court concludes that Levine's claim necessarily sounds only "in premises liability." *Id.* at ___.

Levine's petition, however, *never* alleged that USI controlled the scaffolding at the time of the accident. In the entire petition, the only allegation regarding "control" asserted USI "had

---

[5] It is not clear to me whether the Court intends to say that a fair reading of Levine's petition requires the conclusion that he necessarily alleged (among other allegations) that USI retained control of the scaffold at the time of the accident, or whether the Court intends to say that a fair reading of the petition requires the conclusion that he necessarily *only* alleged that USI retained such control. If the former, then the Court's assertion does not support the Court's conclusion. *See* TEX. R. CIV. P. 278; *Rodriguez*, 995 S.W.2d at 663. If the latter, then the Court simply misstates the pleadings.

direction, control and supervision *over the erection/building of the scaffolding*," which necessarily occurred before the accident. (Emphasis added). I agree we could fairly read Levine's petition to allege that USI created a dangerous condition on Valero's premises by negligently constructing and erecting the scaffold. I also agree that, if the petition could only be read to allege that USI controlled the scaffold at the time of the accident, Levine necessarily asserted a premises-liability claim. *See Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 215 (Tex. 2015). But that is not the "*only fair reading of Levine's pleadings.*" *Ante* at ___ (emphasis added).

Levine alleged that USI committed twenty specific acts of "negligence," but contrary to the Court's assertion, not one of those acts *required* that USI have the right to control the scaffold when the accident occurred. Fifteen of the specified acts, wrongs, or omissions alleged negligent conduct that USI could have committed either before or at the time of the accident, and thus may— but need not—be read to *imply* that USI had the right to control the scaffold when the accident occurred.[6] The other five specific acts, wrongs, or omissions, however, alleged negligent conduct

---

[6] Specifically, the petition alleged that USI was negligent in:

- "failing to adequately determine dangerous conditions created;"
- "failing to adequately warn [Levine] of measures to protect himself from harm;"
- "failing to adequately inspect the scaffolding;"
- "expressly implying the scaffolding was safe for its intended purposes;"
- "failing to correct the dangerous condition which existed with the scaffolding;"
- "failing to maintain the scaffolding in a proper and safe work condition;"
- "failing to secure the scaffolding in a proper and safe work condition;"
- "failing to warn [Levine] that a dangerous condition existed which required extra care to be taken by him while working on the scaffolding;"
- "failing to properly train its employees in recognition of hazards;"
- "failing to promulgate safety practices and administer a proper safety program designed to prevent this type of injury;"
- "failing to provide [Levine] with a safe working environment;"
- "failing to enforce proper safety codes, rules, standards and practices;"
- "failing to properly instruct;"
- "failing to properly supervise;" and
- "failing to ensure the safety of the workers attempting to use the scaffolding."

11

that USI could only have committed before the accident occurred.[7] These five allegations necessarily asserted liability that does not depend on USI having the right to control the scaffold when the accident occurred and thus do not support the Court's inference that Levine necessarily alleged such control. To the extent the Court asserts the petition necessarily only alleged liability that required USI to control the scaffold at the time of the accident, the Court conspicuously fails to address these five allegations.

Even if Levine alleged facts "inconsistent with the position . . . that USI lacked control of the premises at the time of his injury," *ante* at ___, he indisputably also alleged facts consistent with that argument. Levine's allegations that USI improperly assembled, erected, and secured the scaffold, inadequately trained and instructed its agents and employees on properly erecting and securing the scaffold, and erected the scaffold in violation of OSHA standards and its own policies are completely unrelated to any control over the scaffold when the accident occurred. And to the

---

All of these allegations assert actions or inactions that USI could have committed before it ever built the scaffold (*i.e.*, failure to train, instruct, supervise, promulgate safety practices, etc.), when it built the scaffold (*i.e.*, failure to warn, correct, enforce safety codes, etc.), or right after it finished building the scaffold, at least a week before Levine's accident (*i.e.*, failure to inspect, correct, maintain, etc.).

[7] Specifically, the petition alleged that USI was negligent in:

- "improperly assembling, erecting and/or securing the scaffolding;"
- "failing to provide sufficient training and instruction to its agents, servants, employees and/or representatives on the proper erection and use of the scaffolding;"
- "failing to provide sufficient training, warnings and instruction to its agents, servants, employees and/or representatives on the proper assembly, erecting and securing of the scaffolding;"
- "failing to erect the scaffolding in compliance with minimum OSHA standards;" and
- "erecting a scaffolding in violation of Defendant(s) own company policies."

extent any of the alleged negligent acts necessarily asserted USI retained control at the time of the accident, Levine expressly pleaded everything "in the alternative."

The Court also asserts that "the only fair reading of Levine's allegations is that his injury resulted from a physical condition on the property—a hole in the scaffold platform, covered by an unsecured sheet of plywood—and not some contemporaneous activity." *Id.* at ___. This assertion is true but irrelevant. The distinction we have drawn between injuries resulting from premises conditions and injuries resulting from contemporaneous activities is only relevant if the defendant owned or controlled the premises where and when the injury occurred. Specifically, we have held that a contractor who controls the premises at the time of the injury, like a property owner who owns the premises at the time of the injury, has both premises-liability duties and an "independent duty . . . not to injure bystanders by its activities." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005) (citing *Redinger*, 689 S.W.2d at 417). Thus, a premises-controlling contractor's liability to an injured party depends on whether the injury results from a dangerous condition on the premises (in which case, the contractor can only be liable under premises liability) or from the contractor's contemporaneous negligent activity (in which case, the contractor can be liable for ordinary negligence). *Austin*, 465 S.W.3d at 215. But this distinction is irrelevant if the contractor does not control the premises where and when the injury occurs because such a contractor cannot be liable under premises liability at all. *Lefmark*, 946 S.W.2d at 54.

We have relied on the condition/activity distinction in numerous cases, but *only* when the defendant owned, occupied, or controlled the premises when the injury occurred.[8] So the fact that

---

[8] *See, e.g.*, *Sampson*, 500 S.W.3d at 388 (applying activity/condition distinction to determine proper claim against property owner); *Occidental*, 478 S.W.3d at 464 (applying distinction to determine proper "claim against the property owner"); *Austin*, 465 S.W.3d at 215 (discussing distinction in connection with claim against "the

13

Levine necessarily alleged that a condition of the scaffold caused his injuries is irrelevant unless he also necessarily alleged only that USI controlled the scaffold when the injury occurred. Otherwise, if a condition of the scaffold caused Levine's injuries after USI relinquished control of the scaffold, Levine's only proper claim against USI sounds in "ordinary negligence," not in premises liability. *Occidental*, 478 S.W.3d at 647 (emphasis added).[9]

The Court's assertion that Levine creatively "attempted to characterize his claim as something other than premises liability" simply misstates his petition. *Ante* at ___. Levine's petition never asserted that USI had a right to control the scaffold when the injury occurred, and it asserted ordinary-negligence claims that do not depend on USI having such control. It is true that

---

landowner"); *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 775 (Tex. 2010) (discussing distinction of claims "[a]s to landowners"); *Timberwalk Apartments Partners v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) (applying distinction to determine claim against a "landowner"); *Olivo*, 952 S.W.2d at 527 (applying condition/activity distinction to determine proper claim against contractor who "occupied" land and was "in control of the premises"); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) (applying distinction to claim against grocery-store owner); *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259 (Tex. 1992) (applying distinction to determine proper claim against grocery-store owner); *Redinger*, 689 S.W.2d at 417 (discussing distinction as to claims against a "general contractor on a construction site, who is in control of the premises"); *Massman-Johnson v. Gundolf*, 484 S.W.2d 555, 556 (Tex. 1972) (applying distinction to determine proper claim against contractor in control of the premises).

[9] A claim against a contractor who created a dangerous condition but then relinquished control of the premises before any injury occurred is necessarily based not on a premises-liability duty to warn about or remedy a dangerous condition, but on "a duty *in negligence* to use reasonable care not to create the dangerous condition in the first place." *Occidental*, 478 S.W.3d at 642 (emphasis added). The contractor's duty in such circumstances is tied not to the contractor's control of the premises but "to the quality of its contracted work." *Id.* at 646–47; *see Allen Keller*, 343 S.W.3d at 424 (explaining that "general negligence principles apply" to such a claim); *Weekley Homes*, 180 S.W.3d at 132 (explaining that such a claim is no "different from what any bystander might assert" against the contractor for breach of its "independent duty . . . not to injure bystanders by its activities"—in other words, an ordinary-negligence claim); *Strakos v. Gehring*, 360 S.W.2d 787, 790–91 (Tex. 1962) (explaining that even though the injury arises from a condition on the premises, the contractor's continuing liability after relinquishing control of the premises involves "the basic questions of negligence and proximate cause" because it arises from its "failure to use ordinary care" in performing the work, not its failure to warn of or remedy the dangerous condition), 792 (explaining that the contractor's "basis for liability" is that "the contractor's work has been negligently performed"), 794 (explaining that the contractor's post-control liability "is grounded in the public policy behind the law of negligence"). We confirmed in *Occidental* that the contractor's breach of its ordinary-negligence duty "may be judged . . . even after the contractor no longer controls the premises." *Occidental*, 478 S.W.3d at 647; *see also Weekley Homes*, 180 S.W.3d at 132 (noting that contractor's liability remains for creating "premises conditions it leaves behind") (citing *Strakos*, 360 S.W.2d at 790).

14

Levine cannot "circumvent the true nature of [his] claim by pleading it as one for general negligence." *Id.* at ___ (quoting *Sampson*, 500 S.W.3d at 389). But Levine's petition unambiguously asserted ordinary-negligence claims that did not necessarily require, assert, or imply that USI controlled the scaffold when the accident occurred. So if USI is to meet its burden to demonstrate that the trial court erroneously submitted an ordinary-negligence claim, it must demonstrate that the evidence conclusively established that USI controlled the scaffold. Unfortunately, the Court misstates the evidence as well.

## C. The evidence

As the Court explains, neither party disputes that USI is a contractor Valero hired to install, inspect, modify, and dismantle scaffolding at its Port Arthur refinery. *Id.* at ___. Nor do the parties dispute that USI built the scaffold at the refinery at least a week before Levine's accident. *Id.* at ___. And they agree that no USI employees were present at the refinery "on the date of, and at least three days preceding, Levine's injury." *Id.* at ___. Nevertheless, the Court asserts that the evidence supports its conclusion that USI had the right to control the scaffold when Levine's accident occurred. *Id.* at ___. Again, to the extent the Court asserts that *some* evidence supports that conclusion, its assertion is insufficient to establish that the ordinary-negligence question was erroneous. *See* TEX. R. CIV. P. 278; *Rodriguez*, 995 S.W.2d at 663. And to the extent the Court asserts that the evidence *conclusively establishes* that USI had the right to control the scaffold when the accident occurred, the Court misstates the evidence.

Specifically, the Court misstates the evidence by asserting that the evidence conclusively established that (1) USI had a duty to inspect every scaffold at the Valero refinery before every work shift, *ante* at ___; (2) only USI could inspect the scaffolds and authorize their use, *id.* at ___;

15

(3) USI had access to the scaffolds without obtaining Valero's permission, and Valero had no right to access the scaffolds without obtaining USI's permission, *id.* at ___; and (4) USI therefore had a right to control the scaffold at the time of the accident, *id.* at ___. In fact, at least some evidence establishes that (1) USI had no obligation to inspect any scaffold unless and until Valero asked USI to inspect it; (2) Valero's carpenters could also inspect the scaffolds and authorize their use; (3) USI could not access any scaffold without first obtaining a permit from Valero, but Valero could access any scaffold without first obtaining USI's permission; and (4) USI had no right to control the scaffold when Levine's accident occurred.

### 1. Duty to inspect

Citing to USI's and Valero's policies and to OSHA regulations, the Court asserts that the evidence establishes that "USI was required to inspect the nearly three thousand scaffolds at the refinery before each work shift and before each scaffold's use." *Id.* at ___. In fact, although the evidence does establish the scaffolds had to be inspected "before each use," it also establishes that USI only had to inspect any particular scaffold before a shift in which that scaffold would actually be used, and only when Valero notified USI that it would be used.

The only testimony about inspecting a scaffold before a "shift" was from Kenneth Broussard, USI's safety coordinator at the Valero site. Contrary to the Court's assertion, what Broussard actually said was that "many" of the scaffolds—not all—had to be inspected before each shift:

> Q. Now, at the time of the accident, sir, United Scaffolding had several thousand scaffolds out at Valero, correct?
> A. Yes.
> Q. And many of those scaffolds had to be updated every shift–
> A. Yes.

16

Broussard explained that "a lot" of scaffolds were at the refinery on any given day, but they were not all used every day:

> Q. And are all of those in service at the same time?
> A. Sometimes. Sometimes not. Sometimes they prebuild. Sometimes they build them right when they need them. Sometimes they stay up for a while before they get on them. So, there are all different times they build them.

He went on to explain that when USI first constructed a scaffold on Valero's premises, USI was required to inspect the scaffold at that time and "update" its inspection tag to authorize its use on that date:

> Q. . . . You have to update the scaffold when you finish building it, correct?
> A. You put a date on it the day you build it.
> Q. Because you inspect it when you finish, right?
> A. That's correct.
>     . . . .
> Q. —the minute you finish construction, you have to inspect the scaffold, correct?
> A. Yeah. It's inspected when you tag it.
> Q. Okay. And at that point it is ready to use that day, that shift?
> A. Yes.

After construction, an inspection tag had to be updated before any subsequent shift during which the scaffold would be used:

> Q. Now—and those scaffolds would have to be updated prior to use?
> A. Prior to use.
> Q. Okay. Just because you-all built them and nobody was on them doesn't mean something hasn't changed on them?
> A. That's correct.
> Q. Even if it's built two weeks past, the morning that they are to get on them, is it supposed to be inspected?
> A. Yes.

Maximo Cardenas, another Valero pipefitter who was working on the scaffold when Levine fell, testified that a scaffold tag had "to be updated every day" and "every morning." But every other witness—including Valero's and USI's supervisors—clarified, consistent with Broussard's

17

testimony, that inspections were required only for days on which the scaffold would be used. And USI was only required to conduct the inspection if Valero notified USI of its plan to use the scaffold and asked USI to inspect it.

Tony Lawrence, Valero's maintenance supervisor, explained that USI was required to construct or inspect a scaffold only if Valero gave USI a work order letting it know that a scaffold was needed at a particular location on a particular day:

> Q.  Is there something that Valero sends to United Scaffolding to let them know what scaffolds are going to be used on a daily basis?
> A.  Yes. If you need a scaffold, it's a work order go through the—that was generated through the computer. And what we do is we run a copy of it and give it to United Scaffolding, saying what size scaffold we need and what location we need the scaffold on.
> . . . .
> Q.  Do you-all give anything to United Scaffolding to let them know which of those scaffoldings you-all would be using on a daily basis, to your knowledge?
> A.  The way it's set up is that if you have scaffolding up and the scaffold has been up two or three days now and you see where you're going to use the scaffolding the next day, normally there's a procedure where you call Bob [Travis, USI's superintendent] and let him know the day before. And they go out the next day before you get there and update scaffolds.
> . . . .
> Q.  You said that Valero does send notice to United Scaffolding the day before to let them know what scaffold Valero would be using the next day, correct?
> A.  Correct.

Charles Green, a Valero boilermaker, confirmed this and explained that Lawrence would contact USI and let it know when a particular scaffold needed to be "revised" or its tag needed to be updated:

> Q.  Now, when those revisions or changes in the scaffolding needed to be done, who typically would call United Scaffolding for that? Would that be you or—
> A.  The supervisor.
> Q.  —Mr. Lawrence?
> A.  (Witness moves head up and down)

18

Q. Is that a "yes"?
A. Yes.

. . . .

Q. Do you know if there is any policy or procedure regarding inspection of scaffoldings before they are to be used?
A. Yes.
Q. And what do you know about that?
A. We normally get them to update the scaffolding.
Q. When?
A. The first thing in the morning.

. . . .

Q. And how would you-all let United Scaffolding know which scaffolds that are already there that needed to be updated?
A. We tell the supervisors, and our supervisors notify United Scaffolding.
Q. And, so, this one would have been Tony Lawrence?
A. Uh-huh.
Q. Is that a "yes"?
A. Yes.
Q. And they would notify, you said, United Scaffolding?
A. Yes.
Q. Do you know who at United Scaffolding they would notify?
A. Bob [Travis].

. . . .

Q. But you're aware of that policy?
A. Yes. All I know is that we notify that we need an update on a scaffolding; and they come out and update it—look at it and update it.

Travis, USI's superintendent, confirmed that USI was not required to inspect a scaffold unless Valero notified it to do so:

Q. After you guys put up a scaffolding, do you-all ever go by and periodically inspect it or look at it?
A. Every day prior to them going to work on it.
Q. Okay. How about after they start working on it?
A. When we [were] called.
Q. Okay. Do you have to be called or—
A. Yes.

Daniel Benoit, USI's supervisor at the Valero refinery, explained that USI only made revisions to a scaffold if Valero contacted Travis and asked USI to do so, and only inspected the

19

scaffolds when they were first constructed and then upon Valero's request before each subsequent

use:

> Q. What was the practice—back in December, 2005, at Valero, what was the practice on United Scaffolding making revisions? And, by that, I mean, how do you-all know when to make revisions?
> A. We're contacted to go.
> Q. Who contacts you?
> A. Bob tells me.
> Q. And who would contact Bob?
> A. Whoever would need the revisions.
> . . . .
> Q. Do you have to inspect it once it's completed?
> A. Only prior to their use.
> Q. Okay. Well, what about before you put the tag on it?
> A. Oh, yes.
> Q. Okay. So, once it's completed, you look at it and then you put a tag on it?
> A. Yes, ma'am.

And finally, Levine explained that Valero would make sure that the scaffolds were

inspected before he used them:

> Q. And one of the things a refinery makes sure of is if the scaffolding gets inspected before you get out there to do your job, right?
> A. That's correct.
> Q. If the scaffolding had not been inspected, would they allow you to go out there and start working?
> A. No.
> . . . .
> Q. And when you were a supervisor during those times, you, if you needed revisions or something on scaffolding, you, as a supervisor, would call [USI] and get that done, correct?
> A. I don't think I ever called [USI] to do a revision on a scaffold for me.
> Q. But you could as a supervisor. Do you know one way or the other?
> A. I could have.

Ignoring all this testimony, the Court cites instead to USI's and Valero's policies and to

OSHA regulations and asserts that the evidence establishes that "USI was required to inspect the

nearly three thousand scaffolds at the refinery before each work shift and before each scaffold's

use." *Ante* at ___. Neither source is sufficiently specific, however, to support the Court's assertion. The OSHA regulations simply provide: "Scaffolds and scaffold components shall be inspected for visible defects by a competent person before each work shift, and after any occurrence which could affect a scaffold's structural integrity." OSHA Reg. 1926.451(f)(3). While the regulation does not expressly address whether its requirement applies to scaffolds that will not be used on a particular shift, Valero's policy, which adopts the OSHA regulation, confirms that Valero required USI to inspect a scaffold only if an "affected employee" would be working on the scaffold during that shift: "Temporary Elevated Work Platforms shall be built, inspected, and used per OSHA standards, which include the following: . . . CONTRACTORS shall ensure each scaffold is inspected prior to each work shift *before allowing AFFECTED EMPLOYEES to begin work*." (Emphasis added).

This evidence establishes that USI was required to inspect a previously constructed scaffold only before shifts during which that scaffold would be used, and only if Valero contacted USI to let it know the scaffold would in fact be used. As the Court explains, it is undisputed that USI constructed the scaffold on which Levine was injured at least a week before the accident, and Valero did not contact USI to request any inspection or other work on the scaffold before Levine's accident. *Ante* at ___. As a result, consistent with the parties' contract and policies, USI had no obligation to inspect the scaffold before Levine used it, and in fact, USI's employees were not present at the refinery on the day of the accident or for the three prior days.

### 2. Authority to inspect

The Court also misstates the evidence when it asserts that "Valero place[d] upon USI . . . the *sole* authority to authorize Valero employees to use scaffolds USI constructs." *Id.* at ___

(emphasis added). In fact, substantial evidence establishes that others, including some of Valero's employees, had authority to inspect a scaffold and update its inspection tag and thus authorize Valero's employees to use the scaffold.

As noted, the OSHA regulations require that scaffolds "be inspected for visible defects *by a competent person*." OSHA Reg. 1926.451(f)(3) (emphasis added). And although Valero's policy provided that "CONTRACTORS shall ensure each scaffold is inspected prior to each work shift before allowing AFFECTED EMPLOYEES to begin work," the witnesses testified that Valero's carpenters who worked at the refinery were also "competent persons" under OSHA and they too could update an inspection tag. In fact, Valero carpenters had been in charge of updating the scaffolding for "years" before Valero hired USI.

Levine testified that when he got to the scaffold on the date of the accident—December 26, 2005—he checked the tag and confirmed that it had been inspected and updated that day:

> Q. So, how would you know whether or not the scaffolding had been inspected when you got on it . . . ?
> A. Because of the date of the yellow tag.
> Q. And what date was on the yellow tag?
> A. December 26, 2005.
> . . . .
> Q. And is it your testimony that nobody would have had to call for any type of inspection that day?
> A. No, because the yellow tag said that the scaffold was [inspected] December 26th. That's all you need.

When asked about Levine's testimony, Broussard (USI's site safety coordinator) initially asserted that Levine's testimony could not be correct because no USI employees were at the refinery that day:

> Q. But you can't tell me—you can't tell this jury that that scaffold wasn't updated that morning. Fair?
> A. We weren't there, man. We were not in that plant; so, we did not inspect it.

22

He then agreed, however, that Valero's carpenters were also "competent persons" and they could have inspected the scaffold and updated the tag that day:

> Q. Okay. It could have been inspected by someone else, right?
> A. Yeah.
> Q. You don't know if it was inspected by a Valero carpenter or not, do you?
> A. No, I don't.
> Q. Valero has competent people, don't they?
> A. That's correct.
> Q. They could have inspected it that morning, right?
> A. They could have.
>      . . . .
> Q. Okay, sir. Mr. Levine testified the scaffold was updated, correct?
> A. Yes.
> Q. Okay. Do you have any evidence that that's wrong?
> A. Other than the fact that no United Scaffolding people were—we have evidence that we were not in that plant. So, none of our people inspected it. So, yes, I can say we did not inspect it.
> Q. I didn't ask if you inspected it, sir. Could someone else have inspected it?
> A. Sure. A competent person.

In light of these facts, Broussard explained that, if Valero conducted the inspection and updated the tag, the scaffold belonged to Valero for that shift and only Valero was responsible for the scaffold:

> Q. Other than United Scaffolding, who wasn't there, who else at Valero had competent people that could inspect the scaffold?
> A. Valero.
> Q. If Valero went to this scaffolding on the backside of the exchanger and inspected that scaffolding, whose scaffolding does that become?
> A. Not ours because we didn't inspect it.
> Q. Does that become a Valero scaffold?
> A. The responsibility, yes.
> Q. Have they accepted responsibility for that scaffold that they have ensured is now updated?
> A. That's correct.

USI's own testimony thus establishes that USI did not have control of the scaffold when Levine was injured, and that Valero itself was authorized to inspect the scaffold and update the tag

23

and thereby authorize its employees to use the scaffold. The Court misstates the record when it asserts that USI had "the sole authority to give Valero employees to access to scaffolds that USI has constructed." *Ante* at ___ n.4.

### 3. Access to the scaffold

The Court also misstates the evidence when it asserts that USI could access the scaffolds without Valero's permission and that Valero could not access them without USI's permission. According to the Court, Valero "mandate[d] requiring USI to authorize the use of a scaffold following a proper inspection." *Id.* at ___. And, the Court says, "No Valero employee was authorized to construct, use, or dismantle a scaffold without first securing USI's permission." *Id.* at ___. Evidence established, however, that Valero retained control over the scaffolds and that USI could only access the scaffolds if Valero requested and then permitted USI to access them.

Travis (USI's superintendent) explained that USI could access a scaffold at Valero's refinery only after receiving a work order from Valero and then getting a permit from Valero to go to the specific jobsite:

> Q. You guys get an order from Valero who asks you that we need a scaffolding at a certain location?
> A. Yes, sir.
> Q. And then what happens next?
> A. We get a work order from Valero.
> Q. Okay.
> A. And we go to the jobsite, get our permits. From that, go look at the jobsite, see what the safety requirements, especially in a[n] alky[10], is.

---

[10] An "alky" unit is the area of the refinery where Levine was injured. Valero substantially restricted access to the akylation units and required all workers in those units to have special qualifications and wear special protective gear because of the high risk of exposure to dangerous acid.

Broussard (USI's safety coordinator) explained that Valero issued the work orders and permits and USI was required to return them to Valero once USI finished the particular assignment:

Q. When somebody needs a scaffold erected, does [USI] create paperwork?
A. No, ma'am, not that I know of.
Q. Someone had mentioned a work order. You-all had work orders for scaffolds?
A. Yes. I think we had work—yeah, we had work orders.
Q. Is that a document that [USI] would keep once the scaffolding was done?
A. I believe Bob [Travis] said we keep them for a while, and then he would get rid of them. But I believe they had to be turned in, too. All that had to be turned back in.
Q. To who?
A. Valero.
Q. What about the permits for scaffolding? Was that something that you-all would keep?
A. No, ma'am.
Q. Why is that?
A. We have to turn them back in to operations so they can put them in a file.
Q. And operations, who is that?
A. Valero or—yeah, Valero.

And Levine testified that even Valero's own employees had to check in with Valero's "operations" office and have a "head operator" take them to a particular jobsite, especially an alkylation unit like the one he was working on when he was injured:

Q. When you get to the jobsite, what do you do, sir?
A. Over there that's a dangerous unit. Like I say, you have to be specially trained to work on the alkylation unit because that hydrochloric acid is nothing to play with. It will eat you all the way to the bone. You can see the smoke coming out. So, you have to check in with operations.
Q. After you check in with operations, what do you do?
A. You talk with the operators about the job. They explain what type of suit you have to wear to do the job with; and then once they explain that information and make sure you understand it, you have to do a walkthrough with operations on the unit. The head operator takes you out there on the jobsite. And you have to make sure everything is locked, tagged out, and ready to go. If it's not ready to go, you don't work.

25

In light of this testimony, the Court misstates the evidence when it asserts that USI retained control or a right to control a scaffold even if Valero did not send a work order, and that in the absence of a work order, USI retained a right to control but "simply . . . had no reason to exercise its right to control the scaffold at that time." *Ante* at ___. The record contains *no* evidence that USI had the right or the ability to access a scaffold at an akylation unit without first receiving a work order and getting a permit. To the contrary, the evidence establishes that once USI finished constructing the scaffold at Valero's refinery, it had no right or obligation to access or inspect the scaffold unless Valero requested and permitted USI to do so.

### 4.     Right to control at the time of the accident

Lastly, the Court misstates the evidence when it asserts that USI "retained control over the scaffold from construction through dismantling." *Id.* at ___. According to the evidence, USI had no right or obligation to inspect a previously constructed scaffold at the Valero plant unless Valero submitted a work order and granted a permit requiring or allowing USI to assert control over a particular scaffold. The evidence is undisputed that Valero did not submit a work order or grant a permit for USI to inspect the scaffold on which Levine was injured. Certainly, at least, the evidence does not *conclusively* establish that USI had control or a right to control the scaffold at the time of Levine's accident.

### D.     The conclusion

Levine's petition asserted liability based on "negligence." It never alleged USI had control of or a right to control the scaffold at the time of the accident, and none of the alleged specific negligent acts necessarily required USI to have such control. The evidence establishes that USI did not have control of the scaffold at the time of the accident because Valero had not notified USI

that it intended to use the scaffold and had not requested or authorized USI to access or inspect the scaffold since USI finished building it at least a week before the accident. Because at least some evidence establishes that USI did not control or have a right or duty to control the scaffold when the accident occurred, the evidence does not conclusively establish the contrary. As a result, both the allegations and the evidence support the ordinary-negligence question the trial court submitted, and the question was not erroneous.

## II.
## Waiver and Invited Error

The great irony in this case is that the parties undeniably tried the case as an ordinary-negligence case—twice—and did so without any objection from either party. Levine's theory was that USI negligently constructed the scaffold by failing to nail a piece of plywood into place on the platform. In support of that theory, he got Broussard (USI's safety coordinator) to admit that the plywood "should have been nailed down" and that "there is no excuse for that plywood not to be nailed down." He then got Benoit (USI's supervisor) to admit that, even though he was the "competent person" in charge of the team that constructed the scaffold, he did not know at that time about USI's written policy requiring them "to nail down the plywood."

USI also tried the case as an ordinary-negligence case, without ever objecting to that liability theory. In defense of Levine's claim, USI argued it could not have been negligent because it was not present at the refinery on the day of the accident and it had no obligation to inspect the scaffold because Valero did not notify USI that it intended to use the scaffold and did not request an inspection. In its opening statement, USI asserted that if "Valero or a contractor needs a scaffold, they call [USI], because [USI] would have no idea when they will need a scaffold. *They have to tell us*." (Emphasis added). And in its closing argument, it urged the jury, "when you look

27

at the jury charge and you get to that question about [USI] being negligent, what did we do? We weren't there. We couldn't inspect it. How are we negligent? How are we negligent for doing something that we couldn't do but for being absent?" Now, USI argues that Levine could only assert a premises-liability claim because USI actually controlled the scaffold at the time of the accident.

Regardless of the parties' shifting arguments, the important fact is that both parties tried the case, without any objection, as an ordinary-negligence case. At the first trial, USI itself proposed the ordinary-negligence question. After the trial court granted a new trial, the parties tried the case again. At the second trial, the court submitted the same jury charge with the same ordinary-negligence question USI had proposed at the first trial. Although the record does not reveal which party (if any) actually submitted or requested the same charge at the second trial, the record reflects (and USI agrees) that USI did not withdraw or object to the submission of the same ordinary-negligence question it had proposed at the first trial.

Levine argues that, even if his claim could sound only in premises liability, USI waived any complaint about the jury charge by failing to object to the submission of the ordinary-negligence question at trial. The Court recognizes that our rules require a defendant to object to a defective submission of a theory of recovery to preserve error, *see* TEX. R. CIV. P. 279, but holds that Rule 279 is irrelevant here because "the correct theory of recovery was omitted entirely." *Ante* at ___. I disagree. Although a premises-liability claim is independent from an ordinary-negligence claim, it is still rooted in negligence principles. We have held, and the Court specifically notes, *see id.* at ___, that a plaintiff may submit a premises-liability claim by submitting a question on control

and "a broad-form negligence question," as long as "instructions that incorporate the . . . premises defect elements . . . accompany the questions." *Olivo*, 952 S.W.2d at 529.

The jury charge here included a broad-form negligence question but lacked a question on control and instructions on the premises-liability elements. According to the Court's own rule, this is merely a defective submission, not a complete omission. *See ante* at \_\_ ("[T]his case was submitted to the jury under only a general-negligence theory of recovery, *without the elements of premises liability as instructions or definitions . . . .*" (emphasis added)) (citing *Olivo*, 952 S.W.2d at 529 (holding jury charge that asked "a single simple negligence question" about defendant's employee "*omitted essential elements* of a premises defect claim") (emphasis added))). I agree with Levine that USI waived its complaint by failing to object to the omitted elements. *See* TEX. R. CIV. P. 279 (explaining when "omitted element or elements shall be deemed found by the court in such manner as to support the judgment").

Contrary to the Court's assertion, USI's burden to object to a defective charge is neither a "new rule" nor an affirmative defense. *Ante* at \_\_\_n.1. Parties have had the guidance of Rule 279 since 1940. And no evidentiary burden (as would be required of an affirmative defense) underlies the *procedural* preservation burden Rule 279 imposes. *See, e.g.*, *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 229 (Tex. 2011) (noting elements deemed found under Rule 279 must still be supported by sufficient evidence).

And even if USI had not waived its complaint by failing to object, I agree with Levine that USI invited the trial court to err by proposing the ordinary-negligence question. Since the record reflects that the court in the second trial simply used the same question USI had proposed in the first trial, and it does not reflect that USI ever withdrew the question it had proposed in the very

29

same case, USI invited the error of which it now complains. "Parties may not invite error by requesting an issue and then objecting to its submission." *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993) (holding that defendant invited error when it "requested the very issues that it now seeks to avoid"); *see Del Lago*, 307 S.W.3d at 776 ("The error in not allowing Smith to pursue a separate negligent-activity claim, if any, occurred at Del Lago's behest.").

### III.
### Conclusion

The Court misstates the standard of review, the pleadings, and the evidence. Levine asserted an ordinary-negligence claim and pleaded facts supporting that claim. At least some evidence established that USI did not have control of the scaffold at the time of Levine's accident, and the evidence certainly did not conclusively establish that USI had such control. Because the allegations and evidence do not conclusively establish that USI had control of the premises at the time of the accident, I cannot say that, as a matter of law, the ordinary-negligence question was erroneous. Under Texas law, the proper claim against a contractor who negligently creates a dangerous condition on another's land and then relinquishes control of the premises before any injury occurs is a claim for ordinary negligence. And even if all of that were incorrect, USI invited the alleged error and waived its complaint. I would hold that Levine is entitled to recover on the jury's finding that USI negligently caused Levin's injuries.[11] Because the Court does not, I respectfully dissent.

---

[11] USI raises a second issue on appeal, asking whether a trial court's order granting a new trial is reviewable on appeal after the new trial. I would proceed to answer that question, which the Court does not reach.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 30, 2017